IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

PAMELA S. MILLS            )
                           )
v.                         )      No. 2:05-0045
                           )      Judge Nixon/Brown
JO ANNE B. BARNHART, Commissioner  )
of Social Security         )


To:  The Honorable John T. Nixon, Senior Judge


**REPORT AND RECOMMENDATION**

        This is a civil action filed pursuant to 42 U.S.C.
§405(g), to obtain judicial review of the final decision of the
Commissioner of Social Security finding plaintiff no longer
disabled and ceasing payment of disability benefits.  The case is
currently pending on plaintiff's motion for judgment on the
administrative record (Docket Entry No. 10), to which defendant
has responded (Docket Entry No. 16).  For the reasons stated
below, the Magistrate Judge recommends that plaintiff's motion
for judgment be DENIED and that the decision of the Commissioner
be AFFIRMED.


**I.   INTRODUCTION**

        Based on applications filed on June 24, 1991 and July
10, 1991, plaintiff was originally found disabled beginning
October 1, 1990 (Tr. 36-40).  Her case was reviewed on July 17,
1997, and her benefits were continued (Tr. 19, 59-60).  On

1

November 3, 2000, the Commissioner determined that plaintiff had experienced medical improvement and could perform work activity; she was informed that her benefits would, therefore, cease in January 2001 (Tr. 153-56, 172-74). After her request for reconsideration of this decision was denied (Tr. 176-181, 190-92), plaintiff filed a timely request for a hearing before an Administrative Law Judge (ALJ) (Tr. 203).

On May 23, 2002, plaintiff's case was heard by the ALJ, before whom plaintiff, her husband, and a vocational expert appeared and gave testimony (Tr. 350-383). Plaintiff was represented by counsel at the hearing. On February 26, 2003, the ALJ issued a written decision finding plaintiff no longer disabled, and affirming the cessation of her benefits (Tr. 15-24). The ALJ made the following findings:

1.  The claimant has not engaged in substantial gainful activity since the date on which she alleged her disability began.

2.  The claimant does not have any impairment or combination of impairments that meet or equal in severity any listed impairment in appendix 1.

3.  The claimant has had medical improvement in her condition that is related to her ability to work.

4.  The claimant has impairments that are severe.

5.  The claimant's testimony at the hearing was not fully credible.

6.  The claimant's residual functional capacity is limited to a wide range of light work.

7.  The claimant is unable to return to any of her past

relevant work as she described performing it.

8.   The claimant is a younger individual with a limited
     education.

9.   The claimant has no skills transferable to jobs within
     her residual functional capacity.

10.  Rule 202.18 of the medical-vocational guidelines in
     appendix 2 directs a conclusion that the claimant is
     [not] disabled.  In addition, there are jobs that exist
     in significant numbers in the economy that she can
     perform as described by the vocational expert.  These
     jobs include tube coater, table worker, small products
     packer, candy packer, and cleaner.

(Tr. 23).

        On April 6, 2005, the Appeals Council denied

plaintiff's request for review of the decision of the ALJ (Tr. 4-

6), thereby rendering that decision the final decision of the

Commissioner.  This civil action was thereafter timely filed, and

the Court has jurisdiction.  42 U.S.C. § 405(g).  If the

Commissioner's findings are supported by substantial evidence,

based on the record as a whole, then these findings are

conclusive.  Id.


## II.  REVIEW OF THE RECORD

        Plaintiff is a 53-year old woman with a limited (eighth

grade) education (Tr. 354).  She was 49 years old at the time of

her hearing, and 47 years old when her benefits were terminated.

Prior to becoming disabled, plaintiff worked as a sewing machine

operator, a job classified by the vocational expert as light and

3

semiskilled (Tr. 379).

In the February 1993 decision in which plaintiff was found disabled, the ALJ found that she had a severe pain syndrome affecting primarily her cervical area and right arm, with a positive RA factor, as well as low back pain and mild depression (Tr. 39). In reviewing the medical evidence, the ALJ noted an MRI of the cervical spine in November 1990 showing a tiny C5-C6 bulging disc (Tr. 37). A post-myelogram cervical CT showed minimal findings, and it was determined that surgery was not warranted (Tr. 38). In finding plaintiff to be disabled, the ALJ emphasized that RA testing in March 1992 was positive, lending credence to plaintiff's complaints of pain (Tr. 38-39).

In August 1993, plaintiff was evaluated by Dr. Joseph Huston, a rheumatologist to whom she was referred by her treating physician, Dr. Jack C. Smith (Tr. 87). Dr. Huston concurred with the diagnosis of fibromyalgia; he stated that plaintiff had all of the classic symptoms and features of that condition, including "myalgias with muscle tenderness in the appropriate areas, irritable bowel syndrome, paresthesias, and sleep deprivation pattern." (Tr. 89). He felt that her symptoms would improve with treatment, including weight loss and exercise (Tr. 90).

Dr. Marty Gagliardi conducted a consultative examination in June 1997 (Tr. 140). His examination revealed multiple trigger point areas in the upper back and neck area as

4

well as pain along the iliolumbar ligament and SI joints.  Dr.
Gagliardi also found limitations in range of motion of the lumbar
spine (Tr. 140).  X-rays of the lumbar spine revealed disc space
narrowing between L5 and the sacrum, facet sclerosis between L5
and the sacrum and between L4 and L5, and some spurring between
L3 and L4 (Tr. 141).

In the comparison point decision, the July 17, 1997
continuing review determination, plaintiff was found to have
continuing pain in her neck and left shoulder (Tr. 60).  She had
a hard time holding her head down and could not sit for long due
to pain radiating into her leg (Tr. 195).  An MRI of the cervical
spine showed a tiny C5-C6 bulging disc.  It was noted that
plaintiff could not do prolonged standing or walking (Tr. 195).

Dr. R. Douglas Smith has been plaintiff's treating
physician since December 1996 (Tr. 135).  His nurse practitioner,
Tracye Robertson, has seen plaintiff for a number of problems,
including pancreatitis, fibromyalgia, left arm radiculopathy, a
bulging disc, and hypothroidism (Tr. 135-183, 263-274, 310-318,
326-337).

Dr. Donita Keown performed a consultative examination
on September 20, 2000 (Tr. 254).  She concluded that plaintiff
could routinely lift 15 to 20 pounds, episodically lift 30
pounds, and sit at least six hours in a workday (Tr. 256).  This
conclusion was based on her observation of plaintiff ambulating

5

through the clinic with ease, showing no difficulty getting onto
or from the examining table, as well as the following examination
findings:

> intact range of motion at the cervical, thoracic and
> lumbar spine; intact motor strength in both lower
> extremities; normoreflexia; and negative straight-leg
> raise signs.  There is no evidence of diminished motor
> strength in the hands or arms.  There is no evidence of
> joint swelling, redness or warmth on visual inspection
> of the joints of the upper and lower limbs.

(Tr. 255-56).

         In November 2000, Dr. Smith completed a medical
assessment in which he opined that plaintiff could occasionally
lift or carry eight pounds and frequently lift or carry two
pounds (Tr. 258).  He stated that lifting and carrying caused
back pain and aching in the arms.  Dr. Smith further opined that
plaintiff could stand or walk for a total of two hours in a
workday, 15 minutes without interruption.  He cited pain in her
feet, knees, back, and legs with standing and walking (Tr. 258).
He stated that plaintiff could sit for a total of four hours in a
workday, 30 minutes without interruption (Tr. 259).  Sitting
caused stiffness and backache.  Plaintiff was limited in her
ability to reach or push/pull; these activities increased her
back pain as well as the aching in her arms and shoulders.  Dr.
Smith went on to state that plaintiff was restricted regarding
heights, humidity, and vibration (Tr. 259).  At the end of the
assessment, Dr. Smith provided more detail regarding plaintiff's

impairments (Tr. 260). He set forth laboratory results showing a seropositive RA with an elevated sed rate of 36, C-reactive protein of 9.9, and a positive anti-DNP ADS. He also cited fibromyalgia, depression, hypothyroidism, pancreatitis, and neuralgia. Dr. Smith noted that, because she had liver dysfunction from old hepatitis A, plaintiff could not take antihyperlipidemics for her hypertriglyceridemia (Tr. 60).

In June 2001, plaintiff was given an arthritis injection (Tr. 314). She had symptoms of left arm radiculopathy; a cervical MRI was ordered, and she was referred to a rheumatologist. The MRI showed a minimal C5 disc bulge but nothing touching the cord (Tr. 315). In October 2001 and January 2002, plaintiff received additional injections for pain (Tr. 318, 324). In March 2002, lab results showed a sed rate of 26; ALT was 37 and $CO_2$ was 38 (Tr. 323). Plaintiff had been having pain in the right side of her neck for several months (Tr. 323).

At the hearing on May 23, 2002, plaintiff stated that, at the time when she was initially found disabled, she had a bulging disc, arm and neck pain, and depression (Tr. 356). Since then, her back, neck, and arms had worsened. While her original symptoms had been only in the left arm, she had had symptoms in her right arm for about five years (Tr. 356-357). Although muscle relaxers had helped her neck movement, plaintiff still had difficulty turning her head from side to side (Tr. 358). For the

7

past three years, she had been using a massager on her jaws before bed because her neck condition had affected her jaws and ears (Tr. 358).

Plaintiff described the pain in her neck as a constant burning sensation (Tr. 359). Activities such as grocery shopping would make the pain worse; if she tried to pick up a container of milk, her day would be ruined. Plaintiff had difficulty using her arms in front of her body. For example, she could not keep her neck down to read; she would have to hold the book up, and would then have pain in her neck and arms (Tr. 359).

Plaintiff testified that she had had to stop taking Naproxen because of its effects on her liver and stomach (Tr. 360). At the time of the hearing, she was taking Aleve and muscle relaxers. These medications would help her rest and go to sleep. After taking her medications, plaintiff would lie down. She would lie down twice a day for an hour or two (Tr. 360). She testified that her pattern of lying down during the day had not changed since she had been found disabled (Tr. 360-361).

Plaintiff stated that her problems with depression were about the same as when she had originally been found disabled (Tr. 361). She had been tried on several medications, but none of them had helped.

Since she was found disabled, plaintiff had developed some additional problems (Tr. 361). She had been diagnosed with

8

fibromyalgia, which caused pain all over, especially in her feet and legs (Tr. 362). If plaintiff tried to walk much, her hips would hurt. She could walk for about 30 minutes in a store if she had a buggy in front of her; without a buggy, she could only walk for ten minutes (Tr. 362). Plaintiff had been put on a number of medications for fibromyalgia (Tr. 363). The only medication that helped was Vioxx, but she had to discontinue that medication because she developed an upset stomach and high liver functions and got pancreatitis (Tr. 363).

Plaintiff also testified that she experienced constant fatigue from the time she got up in the morning (Tr. 364). She had trouble relaxing and had nightmares all of the time. She described herself as a nervous person; she could not sit for more than about 15 minutes without getting up (Tr. 366). Since the time of the original determination of disability, plaintiff had gotten to the point where she would usually lie down instead of sitting (Tr. 367). She estimated that she could stand for about 30 minutes at a time.

As to her household activities, plaintiff testified that she did what she could around the house (Tr. 365). Sometimes she felt up to cooking, and sometimes she did not. Once a week, she would vacuum the area rug in the front room, a task that took about five minutes (Tr. 366). She usually did one load of laundry a day. Plaintiff stated that she only drove for

9

short distances, such as going to town (a distance of about 21 miles) (Tr. 367). The few times that she had driven to Cookeville, the trip had been very hard on her, and she had spent the next two days on the couch (Tr. 368). Her neck and arms hurt when she drove. While she had once taken great pride in her hair, plaintiff was no longer able to do much styling of her hair (Tr. 368).

Plaintiff testified that she had tried to get her GED since she had been found disabled, but could not concentrate and failed the test three times (Tr. 354).

Ray Mills, plaintiff's husband, testified that he had not seen any improvement in his wife's condition since her injury in 1990 (Tr. 377). In fact, her condition seemed to worsen through the years. She had gotten to the point where going anywhere aggravated her condition. If they went to Crossville or Cookeville, plaintiff would be down the next day (Tr. 377-378). On a good day, she would cook breakfast (Tr. 377). Some days she would be back in the bed in the morning (Tr. 378). Every day she was back in bed or on the couch by one o'clock in the afternoon. Mr. Mills stated that his wife tried to do what she could around the house, but had to take her time doing it (Tr. 378).

The vocational expert testified that the limitations described by Dr. Smith in his medical assessment would not allow for full time work (Tr. 382). He was able to identify a number

10

of  jobs which plaintiff could perform if she was limited as
hypothesized by the ALJ (Tr. 379-381).

### III.  CONCLUSIONS OF LAW

### A.  Standard of Review

This Court's review of the Commissioner's decision is
limited to the record made in the administrative hearing process.
Jones v. Secretary, 945 F.2d 1365, 1369 (6th Cir. 1991).  The
purpose of this review is to determine (1) whether substantial
evidence exists in the record to support the Commissioner's
decision, and (2) whether any legal errors were committed in the
process of reaching that decision.  Landsaw v. Secretary, 803
F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as
a reasonable mind would accept as adequate to support the
conclusion."  Her v. Commissioner, 203 F.3d 388, 389 (6th Cir.
1999)(citing Richardson v. Perales, 402 U.S. 389, 401 (1971)).
It has been further quantified as "more than a mere scintilla of
evidence, but less than a preponderance."  Bell v. Commissioner,
105 F.3d 244, 245 (6th Cir. 1996).  Even if the evidence could
also support a different conclusion, the decision of the ALJ must
stand if substantial evidence supports the conclusion reached.
Her, 203 F.3d at 389 (citing Key v. Callahan, 109 F.3d 270, 273
(6th Cir. 1997)).  However, if the record was not considered as a

11

whole, the Commissioner's conclusion is undermined.  <u>Hurst v.</u>
<u>Secretary</u>, 753 F.2d 517, 519 (6th Cir. 1985).

   B.   <u>Initial Proceedings at the Administrative Level</u>

        The claimant has the ultimate burden to establish an
entitlement to benefits by proving his or her "inability to
engage in any substantial gainful activity by reason of any
medically determinable physical or mental impairment which can be
expected to result in death or which has lasted or can be
expected to last for a continuous period of not less than 12
months."  42 U.S.C. § 423(d)(1)(A).  At the administrative level
of review, the claimant's case is considered under a five-step
sequential evaluation process, as follows:

(1)  If the claimant is working and the work constitutes
     substantial gainful activity, benefits are automatically
     denied.
(2)  If the claimant is not found to have an impairment which
     significantly limits his or her ability to work (a "severe"
     impairment), then he or she is not disabled.
(3)  If the claimant is not working and has a severe impairment,
     it must be determined whether he or she suffers from one of
     the "listed" impairments[1] or its equivalent; if a listing is
     met or equaled, benefits are owing without further inquiry.
(4)  If the claimant does not suffer from any listing-level
     impairments, it must be determined whether the claimant can
     return to the job he or she previously held in light of his
     or her residual functional capacity (e.g., what the claimant
     can still do despite his or her limitations); by showing a
     medical condition that prevents him or her from returning to
     such past relevant work, the claimant establishes a <u>prima</u>
     <u>facie</u> case of disability.
(5)  Once the claimant establishes a <u>prima</u> <u>facie</u> case of
     disability, it becomes the Commissioner's burden to

_____

        [1]The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P,
Appendix 1.

Case 2:05-cv-00045   Document 17   Filed 05/30/06   Page 12 of 22 PageID #: 52

establish the claimant's ability to work by proving the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

Moon v. Sullivan, 923 F.2d 1175, 1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be carried by relying on the medical-vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. Otherwise, the grid can not be used to direct a conclusion, but only as a guide to the disability determination. Id. In such cases where the grids do not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's prima facie case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert (VE) testimony. See Varley v. Secretary, 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity (RFC) for purposes of the analysis required at steps four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere. See 42 U.S.C. §

13

423(d)(2)(B).

C. <u>Proceedings on Continuing Disability Review</u>

The Commissioner's periodic review of benefits recipients is governed by 42 U.S.C. § 1382c(a)(4), as implemented in the regulations at 20 C.F.R. §§ 404.1594 and 416.994. The implementing regulations incorporate the five-step sequential evaluation for initial disability review, but structure the analysis so as to "assure that disability reviews are carried out in a uniform manner, that decisions of continuing disability can be made in the most expeditious and administratively efficient way, and that any decisions to stop disability benefits are made objectively, neutrally, and are fully documented..." 20 C.F.R. §§ 404.1594(f). The result is an eight-step sequential evaluation process, which may be summarized as follows:

(1) Is the claimant currently engaging in substantial gainful activity? If so, benefits will cease.

(2) If not, is a listing met or equaled? If so, benefits will continue.

(3) If not, has there been medical improvement, i.e., any decrease in the medical severity of the impairment(s) present at the time of the claimant's most recent favorable decision, as shown by changes in the symptoms, signs and/or laboratory findings associated with the impairment(s)?[2]

---

[2]20 C.F.R. § 404.1528 provides the following definitions: "*Symptoms* are [the claimant's] own description of [his or her] physical or mental impairment"; "*Signs* are anatomical, physiological, or psychological abnormalities which can be observed, apart from [the claimant's] statements (symptoms)"; "*Laboratory findings* are anatomical, physiological, or psychological phenomena which can be shown by the use of medically acceptable laboratory diagnostic techniques".

14

(4) If there has been medical improvement, is that improvement related to the claimant's ability to do work, i.e., has there been an increase in the claimant's residual functional capacity based on the impairment(s) present at the time of the most recent favorable decision?

(5) If there has been no medical improvement or if there has been medical improvement but it is not related to the ability to work, benefits will continue unless certain limited exceptions apply.

(6) If there has been medical improvement related to the ability to work, is the claimant's current combination of impairments "severe"? If not, benefits will cease.

(7) If so, will the claimant's residual functional capacity based on all current impairments allow for a return to any past relevant work? If so, benefits will cease.

(8) If not, is the claimant capable of performing other work in the economy, in light of her residual functional capacity, age, education, and past work experience? If so, benefits will cease; if not, they will continue.

20 C.F.R. § 404.1594(f).

D.  Plaintiff's Statement of Errors

Plaintiff alleges the following two errors in the ALJ's decision: (1) that he improperly rejected the opinion of her treating physician, Dr. R. Douglas Smith; and (2) that his finding of medical improvement related to the ability to work was erroneously based on the opinion of the consultative examiner rather than the opinion of Dr. Smith, and did not properly consider plaintiff's testimony or the evidence of her cervical impairment.  As explained below, the undersigned does not find error on either of these two fronts.

In carrying out the eight-step sequential evaluation process prescribed for continuing disability review, the ALJ

15

first found that plaintiff was not engaged in substantial gainful activity, and did not have any impairment or combination of impairments which met or equaled the criteria of any listed impairment. Plaintiff does not contest these findings. The ALJ proceeded to determine that there had been medical improvement, citing the findings of Dr. Keown upon consultative examination (Tr. 22). Plaintiff objects to this reliance upon the findings of Dr. Keown, citing the restrictive assessment of Dr. Smith, which would support her case for continued entitlement to benefits.

As an initial matter, it does not appear that plaintiff would disagree that the findings of Dr. Keown, if properly credited, are sufficient to demonstrate medical improvement. Dr. Keown's notation of the presence of full ranges of motion, the absence of joint enlargement, redness, or warmth, and the absence of muscle atrophy or fasciculation, as well as her notation of normal station and gait testing, normal muscle strength in the hands, arms, and legs, and the ease with which plaintiff navigated the clinic and exam table, clearly appear sufficient to support a finding of medical improvement demonstrated by signs and laboratory findings.[3] As the ALJ noted, at the time of the

---

[3]As stated by the Commissioner in her brief before this Court and in her regulations, medical improvement does not require the resolution of the claimant's underlying impairment or the symptoms it causes, but merely the decrease in severity of that impairment, as reflected in either the symptoms it causes or its clinical manifestations. See 20 C.F.R. § 404.1594(b)(1).

16

comparison point decision, plaintiff's pain radiating into her leg prevented her from sitting for any length of time, and the pain in her neck and left shoulder was ongoing, presumably to the same extent that prompted the ALJ in 1993 to describe her as "essentially a one-armed person" (Tr. 39). The findings of Dr. Keown in 2000 clearly indicate medical improvement from those which marked her condition in 1997 and before.

It is the ALJ's finding that this demonstrated medical improvement is related to the ability to work which draws plaintiff's protestations that the opinion of her treating physician, as well as her own hearing testimony, should have been credited as demonstrating significant limitations in her ability to sit, stand, and walk. However, the ALJ discounted Dr. Smith's opinion (expressed in a Medical Source Statement of Ability to do Work-Related Activities, Tr. 258-260) for two reasons: (1) the fact that Dr. Smith did not sign off on plaintiff' treatment notes or otherwise indicate his involvement with nurse practitioner Tracye Robertson's treatment of plaintiff, and (2) the fact that those treatment notes do not support the highly restrictive assessment rendered by Dr. Smith in his medical source statement. Plaintiff cites authority from the Ninth Circuit to the effect that a nurse practitioner working in the office of a physician is an acceptable medical source, whose opinions are properly equated with those of the physician

17

employer.  Even if this were the rule in all jurisdictions regarding treatment given jointly by a nurse practitioner and a physician, the records in this case from Dr. Smith's office do not bear <u>any</u> indicia of his personal involvement with Ms. Robertson's treatment of plaintiff.  Thus, the cases cited by plaintiff[4] -- which all involve a doctor's direct but limited participation in the care of the claimant as part of a team effort along with nurse practitioners or other professionals -- are distinguishable.

In any event, it is clear that the ALJ's second reason for discounting the assessment of Dr. Smith is sufficient, i.e, that his assessment is not supported by the treatment records from his office.  <u>E.g.</u>, <u>Walters v. Comm'r of Soc. Sec.</u>, 127 F.3d 525, 530 (6th Cir. 1997)("[A]ny claim by Dr. Austin that Walters suffered from impairments of disabling severity would not be supported by detailed, clinical, diagnostic evidence in his reports.  This would be a sufficiently valid reason not to accept the opinions of a treating medical doctor.").  Upon reviewing these records, the undersigned would concur with the ALJ's summary of them and his conclusion that follows:

> ... Ms. Robertson's notes generally contain the claimant's complaints, results of any lab tests, a brief physical and assessment and treatment plan.  The

---

[4]<u>Benton v. Barnhart</u>, 331 F.3d 1030 (9th Cir. 2003); <u>Gomez v. Chater</u>, 74 F.3d 967 (9th Cir. 1996); <u>Jerry v. Comm'r of Soc. Sec.</u>, 97 F.Supp.2d 1219 (D. Or. 2000).

18

physical examination at each visit appears cursory. While she may indeed have conducted an extensive physical assessment, her notes generally only include results of HEENT, chest, and heart.  On the occasions where the claimant reported pain in a certain area, she noted whether this area was tender.  There is no mention of range of motion, muscle strength or weakness, sensory or reflex deficits, or muscle spasm. There is an indication that the claimant had an elevated sedimentation rate at one point, with a notation as to possible referral to a rheumatologist, but apparently this was not done.  The musculoskeletal findings she did were minimal and certainly would not support limitations of the degree described in the functional assessment by Dr. Smith.

(Tr. 21).

As to the alleged failure of the ALJ to consider in the proper context plaintiff's testimony regarding her ability to sit during car trips, it is clear that the ALJ did not consider plaintiff capable of making car trips the length of her vacation to the Alabama coast on a routine basis.  Though this trip may have been "murder" on plaintiff (Tr. 376), the ALJ appropriately considered the fact that she would even undertake such a trip, as well as her more usual trips of 35-40 miles or less (Tr. 367, 378), as suggestive of a certain capacity for sitting (Tr. 22).[5] Considered in light of Dr. Keown's assessment of plaintiff's ability to sit at least six out of eight hours (Tr. 256), and plaintiff's own statement before the agency in 2000 that she

---

[5]It is noteworthy that the ALJ did not determine from this and other evidence that plaintiff was unlimited in her ability to sit; rather, he found that she retained the ability to sit for *two out of eight hours* in a workday (Tr. 22).

drove about ten miles on a daily basis (Tr. 147), her testimony regarding her ability to drive does not appear to have been unduly noted by the ALJ simply because she also testified that "[m]y neck and my arms both hurt whenever I drive." (Tr. 368).

With regard to plaintiff's cervical disc impairment, it is clear that the ALJ considered the continuing minimal disc bulge in that area (Tr. 20), but found the current resulting limitations to be mitigated in accordance with Dr. Keown's finding of full cervical range of motion (Tr. 255). While plaintiff continues to complain of discomfort in her neck, and did so when Dr. Keown tested her range of motion there (Tr. 255), it does not appear that the ALJ ever considered plaintiff to be entirely free of cervical pain. The undersigned thus concludes that any limitations from plaintiff's cervical pain are adequately accounted for by the ALJ's finding of "generalized [fibromyalgia] pain that imposes more than minimal limitations on [plaintiff's] ability to perform basic work activities" (Tr. 22).

Finally, the undersigned must note that plaintiff cites evidence that was not before the ALJ in her factual summary (Docket Entry No. 11, p. 7; Tr. 339-340), and in support of her argument regarding her cervical impairment (Docket Entry No. 11, p. 11, n.1; Tr. 340). These items were submitted to the Appeals Council as "new and material evidence relevant to the issues considered by the [ALJ] in his decision" (Tr. 341), but were not

20

the subject of any motion to remand in this Court, presumably because there is no good cause for the failure to include such items in the record before the ALJ. In any case, in reviewing the decision of the ALJ as the Commissioner's final decision, this Court may not consider any such items that appeared for the first time before the Appeals Council. E.g., Cotton v. Sullivan, 2 F.3d 692, 695-96 (6th Cir. 1993).

In sum, the undersigned finds substantial evidence on the record before the ALJ which justifies his finding of medical improvement related to the ability to work, as well as his finding of the existence of a significant number of jobs in the economy which plaintiff could perform in light of her vocational factors and the testimony of the vocational expert. Accordingly, the undersigned concludes that the decision of the Commissioner should be affirmed.

## IV.   RECOMMENDATION

In light of the foregoing, the Magistrate Judge recommends that plaintiff's motion for judgment on the administrative record be DENIED, and that the decision of the Commissioner be AFFIRMED.

Any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to it

21

with the District Court.  Any party opposing said objections shall have ten (10) days from receipt of any objections filed in which to file any responses to said objections.  Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation.  Thomas v. Arn, 474 U.S. 140 (1985); Cowherd v. Million, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

       **ENTERED** this 30th day of May, 2006.


                       /s/ Joe B. Brown
                      JOE B. BROWN
                      United States Magistrate Judge